# Wytheville.

## THE FIRST NATIONAL BANK OF LAWRENCEVILLE v. HOUSE AND OTHERS.

### June 17, 1926.

1. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Purchase of Property by Wife from One to Whom it had been Conveyed by Her Husband—Evidence Held not to Show Fraud—Case at Bar.*—The instant case was a creditor's suit to set aside as fraudulent an agreement between a wife and a purchaser of real property from the husband, whereby the wife purchased the land conveyed to the purchaser by the husband. It was charged that the consideration moved from the husband, and was in fraud of the rights of the creditors of the husband. The sale by the husband to the purchaser fully divested the husband of all manner of interest in the property, and the evidence failed to disclose any fraud or illegality in the wife's purchase from him. On the contrary, it sufficiently appeared that the consideration for her purchase was furnished from a source other than her husband.

   *Held:* That the decision of the trial court that no fraud was proved must be upheld.

2. HUSBAND AND WIFE—*Rights of Husband—Presumption that Property in Possession of Wife is Owned by Husband—Rights to Services.*—Notwithstanding the married woman's act (Acts of 1876-7, p. 333, ch. 329; Code of 1887, sec. 2284; Acts of 1899-1900, ch. 1139, p. 1240, carried in to the Code of 1919 as chapter 207), the presumption prevails that the husband is the owner of all property, real and personal, of which the wife may be in possession during coverture, especially if they are living together as husband and wife; and to overcome this presumption, in a contest between the husband's creditors and the wife, she must show affirmatively that the property is her own, and that it was derived from a source other than her husband and in good faith, if he be insolvent, otherwise a wide door would be opened to fraud. In the instant case, the wife successfully overcame by testimony this presumption.

3. HUSBAND AND WIFE—*Presumption that Property in Possession of Wife is Owned by Husband—Presumption of Law and Fact.*—The presumption that a husband is the owner of property in possession of his wife is not one of law, but of fact—a mere inference, deduction

or conclusion of a fact from another fact or other facts. It is also a mere *prima facie* presumption, and hence may be repelled by testimony. If it were conclusive, it would amount to an estoppel, but in several cases it has been repelled by parol evidence.

4. HUSBAND AND WIFE—*Witnesses—Fraudulent and Voluntary Conveyances.*—Formerly neither husband nor wife was a competent witness in a suit to set aside a conveyance as fraudulent, but under section 6210 of the Code of 1919, which declares that husband and wife shall be competent witnesses to testify for or against each other in all cases, civil and criminal, except as otherwise provided, they are now competent.

5. HUSBAND AND WIFE—*Presumption that Property in Possession of Wife is Owned by Husband—Rebuttal of Presumption—Case at Bar.*—Under the present statute, Code of 1919, sec. 6210, a wife is entitled to the fruits of her own labor expended on her own behalf and not for the benefit of her husband and she has the right to contract and be contracted with. In the instant case, a suit to set aside the conveyance by the purchaser of property formerly owned by the husband to the wife, the wife had in the exercise of her rights and powers, conferred upon her by statute, acquired the property in controversy without the pecuniary aid of her husband.

*Held:* That this was sufficient to repel the presumption against her.

Appeal from a decree of the Circuit Court of Brunswick county. Decree for Defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*B. A. Lewis,* for the appellant.

*Buford & Raney,* for the appellees.

BURKS, J., delivered the opinion of the court.

This is a suit by appellant suing on behalf of itself and other creditors of P. L. House to set aside as fraudulent a contract or agreement between J. R. Temple and Mildred M. House, the wife of P. L. House, whereby she purchased of Temple two parcels of land con-

taining in the aggregate twenty-three acres, with the improvements thereon. The charge is that the consideration moved from the husband and that the transaction was in fraud of the rights of the creditors of the husband. The trial court held that no fraud was proved, and dismissed the complainant's bill.

One piece of the land, six acres, was conveyed to P. L. House in October, 1913, and the other, seventeen acres, was conveyed to him in October, 1915. The purchase price does not appear from the record. Shortly after purchasing, P. L. House erected a handsome brick dwelling thereon. It is conceded that he was insolvent at the time he built the house thereon, but he had sufficient credit to borrow money with which to build. As early as February, 1916, he gave two deeds of trust thereon, but the amounts secured therein do not appear from the record. In October, 1916, there was a decree in a lien creditor's suit against House, directing the trustees in these deeds of trust to sell the property. They made the sale, it was confirmed by the court, the purchase price was paid and a deed made to the purchaser. The purchaser at this sale was W. A. Moseley, the father of Mrs. House. This sale was set aside on a bill filed by P. L. House charging that the purchaser had depressed the price by representing that he was purchasing for P. L. House or his wife, and the purchaser was directed to reconvey the property to P. L. House upon his repayment of the purchase price. The money was repaid by P. L. House and the property was reconveyed by him by deed bearing date February 22, 1918. P. L. House borrowed the money to make the repayment from Mrs. Carpenter, the mother of his first wife, or obtained it on paper endorsed by her, and executed a deed to her of the property bearing date February

27, 1918. The last two mentioned deeds were severally acknowledged February 28, 1918, indicating that the two deeds were simultaneously delivered. The recited consideration of the deed to Mrs. Carpenter was "the sum of $3,000.00 and other good and valuable considerations." This deed, though absolute on its face, was a mortgage to secure to Mrs. Carpenter the amounts advanced by her which subsequently were ascertained to be $11,484.50. Mrs. Carpenter gave P. L. House until January 1, 1920, within which to reimburse her and to obtain a reconveyance of the land. Up to this time P. L. House had an equity of redemption in the land which was liable to the lien of judgments against him.

In the latter part of the year 1919, P. L. House realized his inability to redeem the land from Mrs. Carpenter, and under the advice of counsel, and with the consent of Mrs. Carpenter, he advertised the land for sale at public auction, and the same was sold on December 22, 1919, to J. R. Temple at the price of $15,200. At this sale the property was knocked out to Dr. R. R. Jones, who had previously arranged for J. R. Temple to furnish the purchase money, but after the sale he agreed that it should stand as a sale to J. R. Temple, and that the property be conveyed to him, and this was accordingly done. Jones, who was examined as a witness for the appellant, says he got $500 out of the transaction, but his testimony is vague and indefinite on the subject of what he was paid for and by whom.

The property was conveyed to Temple by Mrs. Carpenter and her husband and P. L. House by deed bearing date December 29, 1919, which deed recites the transaction between the parties leading up to the sale, and acknowledges payment of $15,200, the purchase

price. This deed is assailed as a mortgage given in fraud of the rights of the creditors of P. L. House, but the assault is not sustained by the evidence. We are satisfied that the deed to Temple was what it purports on its face to be an absolute conveyance of the property in fee to Temple, thereby divesting P. L. House of all interest or estate therein.

Mrs. House was greatly attached to her home, and the recited facts show the efforts made by P. L. House, though insolvent, to save it to her, first by aid from her father, and afterwards by the aid of Mrs. Carpenter, the mother of his first wife. These efforts proved ineffectual, and he finally let the property go to J. R. Temple.

Mrs. House testified that it had always been the desire of her life to own a home of her own, and while it looked impossible for her to purchase so expensive a place, yet she was young and healthy, being only twenty-seven when she testified, and she thought that her mother and her father, who was a man of means, would help her "considerably." As her husband's efforts to save the home had proved unavailing, she determined to make an effort of her own, with the feeling, as she described it, "we all take shots at things that may be impossible."

Under these circumstances, she went to Temple shortly after his purchase, and obtained from him a contract whereby she was permitted to remain in the house and to repurchase it at the price he had paid for it, and such reasonable advances as he might make to her, with interest thereon at 8%. She was given until January 1, 1923, in which to complete the purchase and afterwards the time was extended to January 1, 1925. Mrs. House had the dwelling house insured for $9,000 and furniture that belonged to her for $900.

These policies were issued in the name of P. L. House for some reason not clearly explained, but the premiums were paid by Mrs. House, and the policy on the house contained a clause "loss, if any, payable to J. R. Temple." The dwelling and furniture were destroyed by fire in June, 1920, and there was paid to Temple from the insurance money and credited on the contract of Mrs. House the sum of $9,500. She also kept the semi-annual installments of interest due to Temple paid up and made other payments on the principal, so that in December, 1924, the amount due by her to Temple was the sum of $5,399.43. This sum was paid for her to Temple by E. P. Buford and E. R. Temple, a brother of J. R. Temple, and the property was conveyed to them by J. R. Temple by deed bearing date December 24, 1924, in which Mrs. House and her husband united. Buford and E. R. Temple now hold the property under that deed as a mortgage to secure the amount advanced by them.

In the petition for the appeal it is said: "That she has made heroic efforts to keep the 'wolf from the door' may be conceded," and that these efforts have been successful, without fraud on her part, we decide.

Pending her contract with J. R. Temple she borrowed $1,000 from one party, $500 from another, $300 from another and $100 from another, most of which, in one form or another, she still owes. Some of this money she used to pay interest to J. R. Temple, the larger sums were invested in horses and mules which she sold at a profit, and she had some personal property which had been given to her by friends or relatives which she reduced to cash. With the money thus raised she kept down the interest on her debt and made some payments on the principal. E. R. Temple, who loaned her $300, passed her house twice a day.

He testified: "I have seen her with a hoe in her hand working in the hottest of weather from morning to night hoeing cotton." He also said he had seen her picking cotton. "And I don't know that I would have let her have this $300, but I thought that anybody in the world that was endeavoring like she was ought to be helped," and the same motive actuated this witness and E. P. Buford in making the final payment on the land for her.

There is no evidence that P. L. House got a dollar of the purchase money paid by J. R. Temple, or that he contributed a dollar of the money paid to Temple for the property. It is conceded that he was insolvent all the time.

The facts relating to the purchase and sale of the property by J. R. Temple (and we need not go back to this) are not only testified to by P. L. House and his wife, but they are fully corroborated by J. R. Temple, who has no interest in the matter, and of whom it is said in the petition for appeal: "Temple is a man of means, a well thought of and successful business man." His testimony in chief, which was not materially shaken on cross-examination, is given in full:

"Q. You are the owner in fee simple of those two certain tracts of land situate in Totaro district, Brunswick county, Virginia, containing six acres and seventeen acres, respectively, and which were formerly conveyed by Southside Land Company to P. L. House by deeds recorded in deed book 64, page 516, and deed book 67, page 167, respectively, are you not?

"A. I formerly was the owner. I sold them.

"Q. To whom did you sell this land?

"A. I made a deed to Mr. Buford and Mr. Temple.

"Q. State who you purchased this land from, Mr. Temple?

"A. At public auction here. I think Mr. Peterson was commissioner or trustee, or something. I fixed up the papers with him. It was sold at the front of the courthouse.

"Q. The bill of complaint charges that H. F. Carpenter and husband and P. L. House, by their deed dated December 29, 1919, and of record in the clerk's office of Brunswick county, Virginia, in consideration of the sum of $15,200, sold and conveyed this land to you. That is true?

"A. That is what the deed called for. I do not remember the circumstances.

"Q. You bought this property for this amount and this is the consideration you paid for the conveyance?

"A. Yes.

"Q. You bought the property for this?

"A. I bought it at public auction and settled with Mr. Peterson and for a deed from him for that amount.

"Q. State whether or not you bought the land for P. L. House or for yourself?

"A. I bought it for myself.

"Q. You subsequently contracted to sell the land to Mrs. Mildred M. House?

"A. Mrs. House and Percy came over here a few days after I bought it. They told me they wanted it and would pay me rent until they were able to buy it. They thought Mr. Moseley would help her pay for it. I gave Mrs. House a written statement that I would sell the house to her.

"Q. So you contracted to sell the land to Mrs. House?

"A. Yes, I did all the talking with her.

"Q. You did not make any contract to sell the land to P. L. House?

"A. He didn't say anything about buying it himself, but he was always with his wife.

"Q. What consideration was agreed upon?

"A. I think I agreed to take the same price I gave for it, provided I could base the rent on the cost of the place. I didn't expect them to pay for it.

"Q. Has anything been paid on the purchase price?

"A. All of it has been paid. I collected insurance of nine or ten thousand dollars at one time, and seven or eight hundred at another and Mr. Buford and Mr. Temple paid the balance.

"Q. You have reference to Mr. E. R. Temple?

"A. Yes.

"Q. You collected $9,000.00?

"A. I do not know the amount. These different amounts have escaped my memory.

"Q. Anyway the dwelling was burned and all the insurance money on it was collected by you?

"A. Yes.

"Q. Did Mrs. House subsequently pay you anything out of the proceeds of the insurance on the furniture?

"A. There was something said about the furniture. I think she reduced the debt with some of the furniture money. I do not remember the amount; it might have been two or three hundred, or five, or seven hundred dollars.

"Q. Then payments were made from time to time on the note until it was paid by Mr. Buford and Mr. E. R. Temple?

"A. After the house was burned I did not consider the debt a good one and I tried to get all I could.

"Q. The note was curtailed from time to time until taken up by Mr. Temple and Mr. Buford?

"A. Yes. I required them to pay interest twice a year.

"Q. Who made the payments to you?

"A. Always in the name of Mrs. House, in fact Mr. House was not known in the transaction at all. I did not know Mr. House was involved; I thought Mrs. House was buying it with the prospect of getting the money from her father. I thought she was expecting to get some money from her father. In fact, they mentioned it to me.

"Q. As I understand you, Mr. Temple, after you paid the original purchase price at public auction, the house on the property was burned and the insurance money was paid to you?

"A. Yes; I required the company to pay all they could out of the furniture, too. Mrs. House had insurance on the furniture and I thought I had better get all I could after the house was burned.

"Q. Is that the only payment made on the principal of the debt?

"A. I don't think so. I think I bought a horse or a mule from them. I just don't remember all my transactions. I know they paid interest all the time and they might have paid something on the principal.

"Q. Is it not a fact that the balance due you as of January 1, 1925, was the sum of_____?

"A. It was a little more than that. She said she wanted to make some improvements and I said to go ahead and let me see what she was going to do and if it was worth the money I would advance it. In one instance he wanted to build a stable on the place and I advanced the money and included it in the purchase price.

"Q. So after all your transactions and advances what amount of money remained due you about the first of January, 1925?

"A. About $5,500.00; that included interest for six months and some advances.

"Q. The exact amount I find by reference to the papers paid you by Mr. E. R. Temple and myself was $5,399.43. That I understand was the amount that was due you as of the first of January, 1925, by Mrs. Mildred M. House?

"A. Whatever that amount is that is right.

"Q. In consideration of the payment to you of that amount by Mr. Temple and myself you conveyed the land to us and Mrs. House united in the deed?

"A. Yes, with the consent of Mrs. House.

"Q. And that is the balance due?

"A. Yes, on the principal.

"Q. The purchase of the land by you was made in good faith?

"A. I should think so. I would not pay out $15,000.00 unless it was in good faith."

[1] The sale to J. R. Temple fully divested P. L. House of all manner of interest in the property, and the evidence fails to disclose any fraud or illegality in Mrs. House's purchase from him. On the contrary, it sufficiently appears that the consideration for her purchase was furnished from a source other than her husband. In fact, the insurance money alone enabled her to comply with her contract. "We all take shots at things that may be impossible." She took her shot and won, and of this her husband's creditors cannot complain.

[2] Under the original married woman's act of 1877 (Acts 1876-7, p. 333, ch. 329), the common law was so far changed as to allow a married woman to acquire property in her own right by "gift, grant, purchase, inheritance, devise or bequest." She was also permitted to act as a sole trader. But the husband was still entitled to the service of his wife during coverture, and to all profits arising therefrom. This

rule of the common law was left unchanged. *Yates* v. *Law*, 86 Va. 117, 9 S. E. 508, arose under this statute, and it was there said: "Hence the presumption of the law is—and this presumption is not affected by the married woman's act—that the husband is the owner of all property, real and personal, of which the wife may be in possession during coverture, especially if they are living together as husband and wife; and to overcome this presumption, in a contest between the husband's creditors and the wife, she must show affirmatively that the property is her own, and that it was derived from a source other than her husband and in good faith, if he be insolvent, otherwise a wide door would be opened to fraud."

The decision was rested largely on *Seitz* v. *Mitchell*, 94 U. S. 580, 24 L. Ed. 179, construing the married woman's act of the District of Columbia (16 Stat. 45), which also left unimpaired the husband's right to the services of his wife.

The reason for the presumption was two-fold. Usually the husband is the bread-winner of the family, in a financial sense the head of the family, and owns the property found on the family premises, and if the wife has acquired any part of it in the manner allowed by law, it will not impose any great burden on her to require her to prove it. But more especially the relations of the parties are such that their tangible personal property will necessarily be commingled to a greater or lesser extent, and it would be difficult to trace and identify the property of each, and as to other property the title to which was acquired for a consideration it would be contrary to experience to suppose that the wife furnished the consideration, and would impose upon the creditors of the husband an unnatural and an unusual burden to require them

to prove that the wife did not furnish the consideration which she claims to have furnished. It would indeed open a wide door to fraud if all an insolvent husband had to do was to transfer, or to have transferred, his property to his wife, and then require his creditors to prove that she did not furnish the consideration therefor.

The Code of 1887 (sec. 2284) enlarged the powers of a married woman to acquire property of her own by providing that she might acquire it not only by gift, grant, purchase, inheritance, devise or bequest, but also "in any other manner whatever." The quoted words were taken from the Michigan statute, which had been construed to mean any manner other than those enumerated. She was also expressly given the income and profits arising therefrom.

It was not until the Acts of 1899-1900, ch. 1139, p. 1240, carried in to the Code of 1919 as chapter 207, that the property rights of a married woman were fully and clearly defined. It is now declared that "a married woman shall have the right to acquire, hold, use, control and dispose of property as if she were unmarried * * * (and) may contract and be contracted with, sue and be sued in the same manner and with the same consequences as if she were unmarried."

Notwithstanding these enlarged powers of married women, the doctrine of *Yates* v. *Law, supra,* as hereinbefore quoted, has been steadily adhered to in cases arising since the changes in the statute therein referred to. The whole subject has been carefully analyzed and discussed in an able opinion delivered by Judge Kelly in *Johnson* v. *Ables,* 119 Va. 593, 89 S. E. 908. In that case no proof was taken, but the case was decided on the pleadings, and it was held that the presumption aforesaid was sufficient to entitle the creditors of the

husband to a decree setting aside a conveyance to the wife on the ground that the consideration was paid by the husband in fraud of the rights of his creditors. The bill alleged these facts, the answer denied them and there was a general replication. In that case also it is to be observed that the deed was not made to the wife directly by the husband, but by a third party. The presumption, however, was indulged as the bill charged that the purchase price was paid by the husband.

Counsel for the appellee do not controvert the application of the presumption aforesaid, but say that it has been overcome by the testimony, and in this view we concur.

[3] The presumption is not one of law, but of fact— a mere inference, deduction or conclusion of a fact from another fact or other facts. It is also a mere *prima facie* presumption, and hence may be repelled by testimony. If it were conclusive, it would amount to an estoppel, but we have several cases in which it has been repelled by parol evidence. *Kinnier v. Woodson*, 94 Va. 711, 27 S. E. 457; *Lewis v. Palmer*, 10? Va. 522, 56 S. E. 341; *Harris v. Carver*, 139 Va. 676, 1 Va. Spl. Ct. App. 30, 124 S. E. 206.

[4] Formerly neither husband nor wife was a competent witness in a suit of this kind, (Acts 1901-2, p. 798), but section 6210 of the Code declares that: "Husband and wife shall be competent witnesses to testify for or against each other in all cases, civil and criminal, except as otherwise provided." In the revisors' note to this section, after referring to the former statute rendering husband and wife incompetent in such case, it is said: "This provision of the act has been stricken out. It was thought proper to indulge a *prima facie* presumption that the transaction is

fraudulent, but it was considered a step backward to declare that neither shall testify in such cases, as was true at common law." It is clear from this note that the revisors thought that the presumption should continue notwithstanding the change in the married woman's law, and also that it was a mere *prima facie* presumption. Whether or not it is necessary for the testimony of the husband and wife to be corroborated, as is required in the case of survivors of a transaction, or in a suit for divorce, we need not decide, as we are of opinion that the testimony in this case furnishes all of the corroboration that is needed.

[5] Under the present statute, the wife was entitled to the fruits of her own labor expended on her own behalf, and not for the benefit of her husband, and she had the right to contract and be contracted with. Fortune favored her, and in the exercise of the rights and powers conferred upon her by statute she acquired the property in controversy without the pecuniary aid of her husband, and this is sufficient to repel the presumption against her.

We find no error in the decree of the trial court.

*Affirmed.*