ANDY G. CHILDRESS AND KELSEY T. CHILDRESS v. THE FIDELITY & CASUALTY COMPANY OF NEW YORK.

September 10, 1952.

Record No. 3976.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*S. H. & Geo. C. Sutherland,* for the appellants.

*W. Clyde Dennis,* for the appellee.

MILLER, J., delivered the opinion of the court.

This suit in chancery was instituted in the circuit court of Buchanan county by The Fidelity and Casualty Company of

New York, hereinafter called Fidelity, against Andy G. Childress, Kelsey T. Childress, his wife, and C. H. Reagan. For good cause it was transferred to the corporation court of the city of Bristol and there proceeded in to final decree.

The evidence was taken by depositions, and upon submission of the cause to the chancellor, a decree was entered in favor of Fidelity. To that decree this appeal was awarded.

Where not designated by name, Andy G. Childress and Kelsey T. Childress will be referred to as defendants in accordance with their positions in the trial court.

The suit was to subject a tract of land of 138 acres, conveyed by Zach Justice to Kelsey T. Childress on October 17, 1946, to payment of a judgment for $2000, with interest, theretofore obtained by Fidelity against Andy G. Childress. It is claimed that the consideration paid for the land belonged to Andy G. Childress who was insolvent and that title was taken in his wife's name with the intent on their part to defraud Fidelity, and the conveyance is thus voidable.

When this suit was instituted two acres of the land had been sold by Kelsey T. Childress to C. H. Reagan for $9000. Several thousand dollars of that purchase price was still unpaid, and it was also sought to subject that to Fidelity's judgment. The balance owing by Reagan was, however, paid into court and he was dismissed as a party defendant.

It is admitted that Andy G. Childress was insolvent, but defendants say (a) that the judgment, which was obtained against him on April 8, 1946, was voidable and is subject to attack in this suit, and (b) that the evidence shows that the land was paid for by Kelsey T. Childress and thus proof of intent to defraud is wholly lacking.

The defenses asserted require that much of the evidence be stated.

Sometime prior to December 26, 1937, F. M. Ratliff and Andy G. Childress qualified respectively as sheriff and deputy sheriff of Buchanan county, and each gave bond as required by law. Fidelity was accepted as surety upon the official bonds of both officers. In the application of Andy G. Childress to Fidelity to become surety on his bond, he agreed in writing "to indemnify the Company against any losses, damages, costs, charges or expense it may sustain, incur or become liable for in consequence of said bond * * *."

On December 26, 1937, David Rice was shot and killed by Andy G. Childress when the officer attempted to arrest him for the commission of a misdemeanor. Action at law for death by wrongful act was instituted by decedent's administrator against F. M. Ratliff and Andy G. Childress. Fidelity, *as surety on the sheriff's bond,* was also joined as a defendant, and no objection was taken to that procedure. Compromise of that action was effected on July 10, 1939, by judgment for $2000 being taken by the administrator against Ratliff and Fidelity, but no judgment was entered against Andy G. Childress. On July 28, 1939, Fidelity satisfied the judgment by paying $2000 in accordance with the court's final order. On September 21, 1945, Fidelity instituted action by notice of motion against Andy G. Childress to recover the $2000, with interest, which it had paid. The bond given when Childress qualified as deputy sheriff, with Fidelity as surety thereon, was impleaded as a part of the motion for judgment. It was alleged that due to the wrongful killing of David Rice by Childress, and because of his reckless conduct and neglect to perform his duties as deputy sheriff, Fidelity, as surety on his bond, had become liable and had been required to pay the $2000 judgment.

The sheriff's return disclosed that this motion for judgment was served upon Andy G. Childress personally in Buchanan county. No fraud or collusion being involved, defendants concede that the return imports a verity and thus cannot be assailed. *Preston* v. *Kindrick,* 94 Va. 760, 27 S. E. 588, 64 Am. St. Rep. 777; *Sutherland* v. *People's Bank,* 111 Va. 515, 69 S. E. 341; Burks' Pleading and Practice, 4th ed., sec. 46, p. 98.

In support of their defense that the conveyance in question was not in fraud of the creditor's rights, defendants testified that the process was never actually served on Andy G. Childress, that he had no notice of the proceeding, and thus did not appear to defend the action and was not aware that the judgment had been awarded against him until after Kelsey T. Childress had obtained a deed to the land. Defendants also contend that the judgment obtained by Fidelity against Andy G. Childress was in an action under section 8-633, Code of 1950, (section 5786, Code of 1942) for death by wrongful act. It is then stated that it appears from the notice of motion that the action was not instituted within one year from date of death as is required by sec-

tion 8-634, Code of 1950, (section 5787, Code of 1942), and for that reason it is voidable and should be set aside in this suit.

■ We find no merit in this contention. The action was not for death by wrongful act under section 8-633, Code of 1950, (section 5786, Code of 1942). It was an action by a surety to recover from its principal funds paid out by the surety on the principal's liability. Fidelity incurred its liability because of its suretyship, and the principal had expressly bound himself to repay the funds so expended.

Without intimating that the judgment could be successfully attacked under the existing circumstances, were it in fact a judgment obtained under Lord Campbell's Act (section 8-633), we have no hesitancy in holding that the judgment is valid.

The evidence offered by the respective litigants to sustain their contentions concerning the validity or non-validity of the conveyance is in part conflicting, and from some of the testimony different inferences may be drawn.

"On the testimony in deposition form, the decree is presumed to be correct and should not be disturbed for lack of proof if the controlling factual conclusions reached are sustained by a fair preponderance of the evidence." *Klingstein* v. *Eagle,* 193 Va. 350, 353, 68 S. E. (2d) 547. Yet in the final analysis it is incumbent upon us to determine whether the decree is supported by a preponderance of the proof, documentary and otherwise.

As a whole the evidence rather clearly shows that prior to 1946 Kelsey T. Childress had from time to time been engaged in various business activities. During this period she had accumulated some $800 or more, and sometime prior to April 16. 1946, she used that money to make an initial payment on a sawmill which she had decided to purchase and operate. What other funds, if any, were needed to make this purchase, and if so, by whom furnished, does not appear from the evidence. Upon acquisition of this mill, it was moved by her husband from its then location to a site near the forks of Big Prater Creek in Buchanan county. On April 16, 1946, after having made location of the mill, she formed a partnership with Auty Coleman and G. B. Coleman, and the three entered into a written agreement of partnership and began operation of the sawmill.

The partnership agreement which is filed in evidence provided, among other things, that each partner was to contribute the sum of $2500 to the enterprise, and the business was to be

conducted under the name of Big Prater Lumber Company. The mill and a truck that Kelsey T. Childress owned were put in by her as capital, but it does not definitely appear whether the mill and truck made up the full $2500 that she was to contribute. Operation of this mill by the three partners was successful and profits were realized by the owners. The fact that these three parties, Kelsey T. Childress, Auty Coleman and G. B. Coleman, made up the partnership is shown by the written agreement and by the testimony of the Childresses and Auty Coleman. Yet the letter also said that he and G. B. Coleman negotiated with Andy G. Childress for purchase of their interests in the business, and from some of his testimony it could be inferred that he considered Andy G. Childress to be then interested in the mill as part owner.

When operation of the mill was begun, it was agreed between all interested parties that Andy G. Childress was to represent his wife and be manager of the mill, keep the books, and as manager sign all checks for the partnership; G. B. Coleman was to supervise cutting of the timber; and Auty Coleman was to be in charge of the trucks and move the cut logs to the mill.

By written contract of September 26, 1946, (filed as an exhibit), Auty and G. B. Coleman sold their entire interest in the Big Prater Lumber Company to Kelsey T. Childress. The exact consideration paid to the Colemans is not made evident, but it appears that they received two-thirds of the profits during the time that they were partners in the enterprise and a further consideration when they sold out their interests.

After the shares of the Colemans had been acquired, Kelsey T. Childress and her husband continued to operate the business. Though he conducted the business, the evidence fails to disclose that any funds belonging to him were used to purchase the sawmill when first acquired or that any of his funds were thereafter invested in the enterprise. His services, however, were given without charge to his wife, and he received no salary but was allowed to draw on the mill funds for himself at times and when necessary. In short, he drew no fixed or recognized salary, but he and his wife said that he obtained a living from the business by working for her.

Before the interest of the Colemans in the mill was acquired by Kelsey T. Childress, she decided to contact Zach Justice about the tract of timberland which he ultimately conveyed to her and

which is the chief subject matter of this litigation. She first went to see him about purchasing that property and talked with him at length about the matter. At a somewhat later date, and after she had acquired the Coleman interests, she and her husband conferred with Justice, and on other occasions Andy G. Childress discussed the prospective purchase of the land with him. The purchase price was $5000, of which a $2000 cash payment was required, and the balance of $3000 was to be paid on time. The sum of $1500 was borrowed from one Bayless Callahan on a ninety-day note executed by Kelsey Childress and Andy G. Childress. That sum, along with $500 which the defendants say was obtained from sale of lumber, etc., from the mill when owned by Kelsey T. Childress and the Colemans, was used by her to make the cash payment.

The $2000 was paid to Justice, and on October 17, 1946, two notes in the respective sums of $1000 and $2000, with interest, and payable at six and twelve months after date, were executed by Kelsey T. Childress and delivered to Zach Justice. They evidenced the deferred part of the purchase price. On that date a deed was also executed and delivered by Zach Justice conveying the tract of land to Kelsey T. Childress. These two notes, along with the $1500 borrowed from Callahan, were later paid out of profits made from the mill.

The deed to Kelsey T. Childress was not recorded until November 9, 1948, which was a day after a deed was executed by Kelsey T. Childress and husband conveying a part of this tract of land to C. H. Reagan, which deed was likewise recorded November 9, 1948. It was the recordation of these instruments which apprised Fidelity of the fact that this tract of land had been acquired by Kelsey T. Childress.

Other testimony shows that for some years immediately previous to the time that Kelsey T. Childress first acquired the sawmill which was operated by her and the two Colemans, with Andy G. Childress acting as her manager, he, Childress, had been gainfully employed. He had served in the merchant marine and over periods of time worked for several different employers and had on occasions earned as much as $500 a month. It is contended that from these circumstances it should be inferred that his funds went into the purchase of the mill and land. But no funds earned or saved by him are traced or shown to have been used to pay for either the mill or the land.

In *Atkinson* v. *Solenberger*, 112, Va. 667, 672, 72 S. E. 727, it is said:

"It is settled law in this State, that in a contest between the existing creditors of an insolvent husband and his wife, touching an alleged purchase from her husband or from another with means furnished by him, the transaction is *prima facie* presumed to be actually fraudulent and the burden is on the wife to show by clear and satisfactory evidence that the consideration was in good faith paid by her out of her own separate estate, and not by her husband."

The principle is adhered to in *Johnson* v. *Ables*, 119 Va. 593, 596, 89 S. E. 908. There the inference of fact that the consideration was furnished by the insolvent husband is extended to include a conveyance to the wife by a third party though there be no evidence that the husband furnished the funds.

Judge Kelly, speaking for the court, quoted with approval from Dean W. M. Lile's Notes to 1 Minor's Institutes, page 75, as follows:

"So prone is an insolvent husband to undertake to shield his savings from his creditors by investing them in property purchased in his wife's name, that the principle has been established that every purchase made by the wife of an insolvent husband, though from third persons, *is presumed to have been made with money furnished by the husband,* [when the transaction is attacked by his creditors]; and the burden of proof is on her to show that such is not the case, but that she had a separate estate with which the purchase was made." (119 Va. 593, 601) *Harris* v. *Carver*, 139 Va. 676, 124 S. E. 206, and *First Nat. Bank* v. *House,* 145 Va. 149, 133 S. E. 664.

In these decisions the effect of the Married Woman's Act, Acts 1899-1900, ch. 1139, p. 1240, (as amended, section 55-35, *et seq.,* Code of 1950) was considered and discussed. That legislation as enacted and as it now appears reads in part:

"A married woman shall have the right to acquire, hold, use, control and dispose of property as if she were unmarried * * *", section 55-35, and "A married woman may contract and be contracted with, sue and be sued in the same manner and with the same consequences as if she were unmarried * * *," section 55-36.

And though the conveyance was made by a third party to the wife, it was held in *Johnson* v. *Ables, supra,* that because of

the relation of husband and wife, an inference of fact arose that the consideration was furnished by the insolvent husband, and the conveyance to his wife was thus presumptively voluntary and in fraud of his creditors and cast the burden upon her to prove clearly that she in fact furnished the consideration.

We need not and do not approve or disapprove the principle, as thus applied. We are content to say that it is universally known that married women have for some years engaged freely in the purchase and sale of real estate and all other kinds of property. They now conduct business enterprises of almost every nature in which acquisition and disposal of property is required, and the *bona fides* of these transactions must be determined by the facts of each case.

Here the evidence establishes that the insolvent husband donated his services to his wife by managing and conducting her business while his creditor remained unpaid. That is a practice not lending itself to commendation. Yet the gift by the husband is not unlawful, and of itself, it is insufficient to convict the wife of fraud. Acquisition by her of property with funds derived from her business so gratuitously conducted by her husband as her agent may not, on that ground alone, be set aside by his creditors.

"Since his creditors have no lien on his labor or any way to compel him to work, a debtor may legally give his entire time, skill and industry to his wife, in aiding to carry on a business owned by her, and his creditors cannot complain of his doing so, since such a donation of services is not inconsistent with his obligations towards them." 28 A. L. R. 1046, 1048.

"Husband conducts business as agent for wife: Whether an arrangement by which a wife conducts a profitable business through the agency of her insolvent husband is bona fide or colorable, and merely to cheat the husband's creditors is a question of fact to be determined by all the facts and circumstances of the particular case. The fact that the wife has neither experience nor a separate estate at the time she purchases goods on credit and begins a business, which is conducted solely and exclusively by her insolvent husband as her agent, is a circumstance to be considered in connection with other evidence in determining the bona fides of the wife, but is not alone sufficient to charge the wife with fraud." 9 Michie's Jurisprudence, Fraudulent and Voluntary Conveyances, sec. 26, p. 39.

■ "Relationship is not a badge of fraud. There is no law which forbids persons standing in near relations of consanguinity, affinity, or business, from dealing with each other, or which requires them to conduct their business with each other differently from the manner in which they conduct it with other persons. But as fraud is generally accompanied by a secret trust, the debtor usually selects some person in whom he can repose secret confidence. And as this trust and confidence is more likely to exist between relatives, or those who occupy confidential relations, their transactions with each other, when fraud is charged, will be more closely scrutinized." *Johnson* v. *Lucas*, 103 Va. 36, 40, 48 S. E. 497.

■ The documentary and other evidence clearly proves that the sawmill was in the first instance purchased and owned by Kelsey T. Childress. When operated by her husband, he did so as her agent and manager and not on his own account. The profits derived belonged to her and not to him. These funds were used by her to purchase the 138 acres of land which enhanced in value, and from the manufacture of the timber thereon, considerable profits were made. Profit was also made by the sale of a valuable parcel of this tract to C. H. Reagan. This land, its enhanced worth, and the profits thus derived, are, however, traceable to and are the result of her original purchase and her business enterprise, and not her husband's.

It does not appear that the conveyance by Zach Justice to Kelsey T. Childress was in fraud of Fidelity's rights. The land was paid for by her, and neither it nor the funds now on deposit with the court are subject to the judgment held against her husband.

The decree is reversed and the cause remanded for entry of a decree not in conflict with the views expressed herein.

*Reversed and remanded.*