12593

CANTEY v. SUMMERSETT & COMPANY *ET AL.*

(147 S. E., 635)

514

515

516

517

518

520

522

524

*Messrs. Thomas & Lumpkin,* for all appellants

526

*Mr. John J. Earle,* for appellant Jesse T. Reese,

*Messrs. D. W. Robinson* and *D. W. Robinson, Jr.,* for respondent,

February 14, 1929.

The opinion of the Court was delivered by Mr. Justice Cothran.

Mr. Justice Cothran: This is an action by the plaintiff, Cantey, who was appointed Receiver of the property of E. T. Summersett, in supplementary proceedings, for the purpose of subjecting certain property standing in the name of a corporation, "Edward L. Summersett, Inc.," to the payment of certain judgments against E. T. Summersett, upon the ground that the corporation was organized and has been used as a scheme on the part of E. T. Summersett and the other defendants to hinder, delay, and defraud his existing creditors; that in good conscience and equity E. T. Summersett is the owner of all of the property standing in the name of the corporation. Hereafter the corporation Edward L. Summersett, Inc., will be referred to as the "Corporation."

It appears that in the years 1912, 1913, and 1914, flush times in the City of Columbia, E. T. Summersett embarked heavily in the purchase of real estate; his enterprises resulted in tremendous losses; and in 1919 there were judgments outstanding against him amounting to nearly a quarter of a million dollars; he was hopelessly insolvent. Among his liabilities was a bond, secured by a mortgage of real estate, to Smathers and Cotter, upon which there was due about $11,-000. He had a wife and several children dependent upon him, and practically not a dollar; his sole assets were his energy and muscle. With the promised assistance of the defendant Reese, who had agreed to finance the project, he determined, in 1919, to go into the business of buying lots, the erection of buildings, and the sale of the property so improved, upon terms of credit.

The arrangement with Reese contemplated the formation of a corporation under the name of Edward L. Summersett, Inc., which was accomplished in September, 1919. It appears that only 15 shares of stock were issued: Edward L. Summersett, 5 shares; E. T. Summersett, 4; Elizabeth Sum-

mersett, 3; Susie Summersett, 3. All of this stock was assigned in blank and delivered to Mrs. Summersett, the wife of E. T. Summersett.

The purpose of the formation of the Corporation is thus explained in the minutes of October 6, 1919:

"That all stock issued by said Company should be assigned to Cora L. Summersett to keep and hold as long as she may live, should she die the stock should be given to her children, the four shares to E. T. Summersett going to their daughter Cora Lee Summersett the second; E. T. Summersett was to be fully authorized and empowered to handle all business of any nature of this corporation without any question, but no moneys beyond $250.00 per month was to be spent by him for personal use but that his wife Cora Lee Summersett was empowered to spend at any time any amount she deemed best. All funds and assets should be held together during the life of Cora L. Summersett, and should she die all holdings should be equally divided between their living children or their childrens' heirs should they be dead. It was also to by that no dividends should be declared by said Company but if for any reasons E. T. Summersett, Cora L. Summersett, 1st, or Edward L. Summersett, Elizabeth Summersett, Susie Summersett, Cora Lee Summerset, 2nd, should become dependent for support that E. T. Summersett was empowered to any or all amounts for their support. In case of death of E. T. Summerset, his wife Cora L. Summersett was to be authorized and have all handling of all funds and hold of said Company and at her death to divide it equally between their children. In case if she should marry another then the holding should be divided to her children. If E. L. Summersett should die E. T. Summersett should continue to handle the business unless or such time. That if he should again marry that all holding of said Company should be divided between their children. After this explanation upon the part of E. T. Summersett a motion was made by Elizabeth Summersett and seconded by E. L. Summersett that

the explanation should be a resolution and adopted and so recorded by unaminous vote this was done."

The arrangement with Reese is thus detailed in the answer of Reese, which appears to be sustained by the evidence and by the circuit decree:

"That the said E. L. Summersett & Co., Inc., not having funds with which to buy real estate and to construct houses, this defendant entered into an agreement with the said Corporation, under and by the terms of which this defendant advanced moneys from time to time to the said Corporation, with which to buy real estate and to construct houses, the said Corporation agreeing to repay to this defendant all moneys so advanced, together with interest thereon, calculated monthly and together with the additional sum of two hundred dollars on each house sold by the said Corporation, the same to be in full payment to this defendant for all advances made by him and for all of his services and commissions, and that in order to secure the repayment of all of the same, the said Corporation, from time to time, gave to this defendant mortgages of its real estate and further assigned to this defendant as collateral, various purchase money mortgages which had been given to it, said assignments having been recorded upon this defendant being advised by his attorney that the law now provided for such papers to be so recorded."

In January, 1920, both E. T. Summersett and his wife, Cora L., filed petitions in bankruptcy and were adjudicated bankrupt, and in May, 1920, were discharged. At that time, while the business arrangements referred to had been perfected with the defendant Reese, nothing had been done towards carrying them out. In the schedule filed by E. T. Summersett in the bankruptcy proceeding, a certain bond and mortgage held by Smathers and Cotter, it appears, were inadvertently omitted. Consequently these mortgages were not affected by the bankruptcy proceedings. They accordingly instituted foreclosure proceedings, and in September, 1920,

recovered a judgment against E. T. Summersett for $11,-361.32 and obtained a decree of foreclosure and sale. The sale was had, the property did not bring the amount of the mortgage, and on July 5, 1922, a deficiency judgment of $4,008.02 was entered. The execution issued thereon having been returned *nulla bona,* the plaintiffs instituted supplementary proceedings against E. T. Summersett, and in them had the plaintiff, Cantey, appointed Receiver for E. T. Summersett, with the usual powers of gathering his assets together for application to the execution. In that way the Receiver has become plaintiff in this action.

Issues were joined by the filing of answers by the several defendants, and the case came on to be heard by his Honor, Judge Townsend, in equity. A mass of testimony was introduced, pratically 80 per cent. of which was evidence adduced in the supplementary proceedings. Seven witnesses, whose testimony covers about 100 of the 450 printed pages of the transcript, were examined before his Honor, Judge Townsend.

"This hearing resulted in a decree filed by Judge Townsend giving judgment in favor of the plaintiff, and holding that Edward L. Summersett & Co. was fraudulently conceived and operated, and amounted to a hiding of assets on the part of E. T. Summersett. The decree further subjected such assets to the payment of the judgment of Smathers and Cotter, and that the claim of such plaintiffs was paramount to and should be paid prior to any claim or demand held by Jesse T. Reese against the assets of Edward L. Summersett & Co. The decree also gives personal judgments against Jesse T. Reese for the amount claimed by the plaintiffs.

"All of the defendants in the case appealed except Roof Lumber Company and Marion A. Park. The defendant Jesse T. Reese filing separate exceptions herein and the other defendants, including Edward L. Summersett & Co., E. T. Summersett, Cora Lee Summersett, Sr., and the children filing one set of exceptions as covering their appeal herein."

It appears that in April, 1920, after the adjudication in bankruptcy and before the discharge in May, the defendant Reese began the advancements in cash to the corporation, which were secured by the mortgage of the corporation duly authorized by the stockholders and by the assignment of certain bonds and mortgages which had been taken by the corporation in the conduct of the business as contemplated.

In January, 1925, it appears that the corporation owed Reese $28,888.40 for advances of cash, interest, and the bonuses which the corporation had agreed to pay Reese for his financial assistance, which was secured to Reese by a mortgage of certain property owned or in the name of the corporation and by the assignment of various mortgages and equities in mortgages held by the corporation. At the time of the hearing before Judge Townsend in February, 1927, this balance had been reduced to "something over $19,000."

The decree adjudicates:

(1) That the corporation be declared fraudulent, null, and void so far as the debt to Smathers and Cotter is concerned.

(2) That the plaintiff have judgment against the corporation, E. T. Summersett, *and the defendant Reese,* for the amount of the Smathers and Cotter debt, amounting to $5,307.07, as of February 22, 1927, with interest from that date.

(3) That the defendant Reese hold all the collaterals, notes, and mortgages, and equities in collaterals now in his hands, as trustee, for the payment of said indebtedness.

(4) That the plaintiff have leave to apply for such orders as may entitle him to take over all of the assets of the corporation in conformity with his ruling:

"I therefore find and conclude that the assets and accumulations of property in the name of Edw. L. Summersett & Co., are in equity and good conscience the property and assets of Edward T. Summersett, and should be applied toward

the satisfaction of the judgment in favor of Frank Smathers and Richard J. Cotter," with provisions for costs and attorneys' fees.

We do not think that there can be any doubt but that E. T. Summersett, in his hopeless insolvency, conceived the double project of going into bankruptcy and ridding himself of the mountain of debt under which he lay, and of organizing a corporation for the benefit of his wife and children into which the fruits of his future energies might be preserved and protected from the grasp of his creditors, and applied to the first obligation which he owed, the maintenance and education of his family.

Assuming then that these were his purposes and that he supplied the money necessary to the stock subscriptions, the certificates for which were issued in the names of the members of his family, we do not think that the validity of the corporation was at all affected thereby.

The decree contains no finding that the capital stock represented by the 15 certificates issued was in fact paid in. It is said:

"No record was made of the subscriptions for the capital stock who, *if any one,* paid them in, or the amounts paid * * * it is more than probable that whatever money was contributed for this purpose was contributed by E. T. Summersett who was to have sole management of the corporation, from his own funds."

Nor is there any finding as to the net worth of the corporation; it may have gone upon the rocks, for all that appears to the contrary, and the stock worthless.

It is possible that, if the whole $1,500, representing the certificates issued, had been supplied by E. T. Summersett, and the stock had been transferred to his wife and children for the purpose of defrauding his creditors, the creditors may have had the remedy of holding the assignees of the stock as trustees for them and thus force an assignment by them to the Receiver and realize upon the value of the stock

if it has any, but this is not such a proceeding. If it were, there are not sufficient facts shown upon which to base relief.

So far as the devotion of his *energies* to the benefit of his wife and children is concerned, that is not a matter of which the then existing creditors have a right to complain. This proposition is clearly sustained in the case of *Hodges v. Cobb,* 8 Rich., 50. The facts in that case were these:

A man named White and a man named Mosely married sisters. In 1849 Mosely was hampered by judgments and executions, and in fact insolvent. White was well-to-do, and advanced money because of his relationship and friendship to Mosely to use in buying and selling negro slaves, and he returned to White the principal and the net profits, who *agreed and stipulated* that he would give one-half of those profits to the wife of Mosely. Mosely made money out of this transaction. Under this state of facts the plaintiff brought suit, trying to hold certain slaves and moneys in the hands of Mosely to settle a judgment due the plaintiff Hodges by Mosely, *claiming that the agreement between Mosely and White worked a fraud upon Hodges as a creditor, and that he was smuggling the fruits of his skill and labor into a form that should benefit his family and indirectly himself, whereas his creditors were and are entitled to such fruits.*

The Court held: "All must agree that if Mosely had been so unmindful of the duties of life as to work not at all, or for half price, or for nothing, his creditors could not have pricked him up, with their executions. That he should have left his family to starve would have brought neither consolation nor profit to them. What stimulated his exertions— what produced the fruits that make the subject of this litigation? The answer is, that a benevolence of White; a stranger to Mosely's creditors, toward Mrs. Mosely, his sister-in-law, set in motion the debtor's industry; and the use of White's capital, Mrs. Mosely being the meritorious cause and object, produced the fruits now in contest. *These*

*have been created by a cause, and a means over which the creditors had no control, and from whose liens they were wholly free, and when they were in posse merely were devoted, by agreement, to an object most worthy in the eye of all sound morality."*

It was also said: "It is very true, on the other hand, that this debtor could not have set apart the fruits of his labor, after they had been earned, in trust for his wife and children"—the reasoning being that such property would have been property *in esse*.

The Court adds: "But if he had agreed to sell his labor to White, on terms the most improvident, as for his mere maintenance or for less, how could his creditors have rectified that? If he had made a more reasonable and thrifty contract with White, as, for example, that he would labor for him, on condition that he would maintain his wife and children, and articles consumed in the use were accordingly applied, what fraud would there be, in such case, upon creditors—what scope would have been found for their executions—what would they have lost to which they could show any title? If White, by the promptings of a benevolent sympathy, should have agreed to add something more enduring, in the hands of a trustee, for the use of the wife, no infringement of a creditor's right can be detected in that."

And: "Although it is conceivable, that, under stipulations such as characterize this case, an insolvent debtor might be enabled to engage his labor and skill upon means, trusted to him by a benevolent friend of his wife, upon previous stipulations so liberal as to endow her trustee with a sum large enough to make the transaction seem a mockery in the eye of the creditor, and *although we admit that, in an adventure so fortunate,* his just expectations would be sadly disappointed, yet the question *would still be as to the range of his execution,* not his expectations; and, on the other hand, we see that the principle of this appeal would make it a fraud, if, in pursuance of a debtor's stipulation in the

morning, the proceeds of a day's work by him should be applied, in the evening, in the shape of *bread* towards the maintenance of his family. *Neither difference* in sums, nor in time, fortunate or unfortunate adventures, provident or improvident contracts, in a debtor's selling *his labor by previous stipulation,* can alter a principle."

In *Zimmerman v. Dean,* 54 S. C., 90, 31 S. E., 884, it was held, quoting syllabus: "An insolvent husband may give his services and those of his minor children to his wife as against his creditors."

The Court quotes from the *Hodges case* approvingly, and says: "There is no constitutional provision against this construction of the law, as it was not a gift of something *in esse,* nor of anything that would become *in esse, except by the labor of the husband*. Sound morality and public policy sustain this view."

Judge Freeman, in a note to *Morris v. Fletcher,* 77 Am. St. Rep., 101, makes the proposition as clear as the sunlight. Referring to the *Hodges case*, he says: "In the second case, however, the husband used his labor and skill in the service of a third person. He could have given his services to such third person if he had desired, and the profits resulting from the business would have belonged to the third person, because he was a competent person to receive such a gift. His creditors could not object, because the husband had acquired no property which could be reached by them. His skill and labor resulted in profits which belonged to a third person, hence his creditors could not touch them. * * * This fundamental principle must be remembered, viz., that a debtor is not obliged to work for his creditors or to work at all. His creditors cannot levy execution upon him and compel him to work for them. While a creditor [debtor?] cannot set apart the fruits of his labor after they have been realized, in disregard of the rights of his creditors, yet before they are earned he may make any bargain he wishes in regard to his services and his creditors

are not defrauded, because they have been deprived of nothing to which they have a right."

"The creditors of an insolvent have no claim upon his services, and he may give them away by working gratuitously for another." Note, 21 L. R. A., 624, citing *Sexton v. Martin*, 37 Ill. App., 538, *Osborne v. Wilkes*, 108 N. C., 651, 13 S. E., 285.

"A debtor may agree to carry on business for his wife in consideration of support of his family and mother without giving his creditors any claim on the profits arising from his services." Note, 21 L. R. A., 625, citing *Scoville v. Shed*, 120 N. Y., 646, 24 N. E., 1102.

There can be no difference between this state of facts and an agreement to carry on the business of a corporation, all of the stock in which has been assigned to the wife.

"The creditor cannot impute fraud to the transaction by which the debtor gives his labor to his wife, for the creditor has no legal or equitable right to that labor." Note, 21 L. R. A., 625, citing *Buckley v. Dunn*, 67 Miss., 710, 7 So., 550, 19 Am. St. Rep., 334.

In *Mayers v. Kaiser*, 85 Wis., 382, 55 N. W., 688, 21 L. R. A., 623, 39 Am. St. Rep., 849, the Court said: "We are unable to understand how the husband's creditors can be said to be defrauded, when they cannot compel him to labor for their benefit, if he voluntarily bestows on others, or on his wife, that which, under the law, they cannot reach for the satisfaction of their demands."

In *Grand Lodge v. Allen*, 208 Ala., 292, 94 So., 343, 28 A. L. R., 1043, the syllabus is:

"1. A debtor may give his labor or service as a gratuity to another, and when he chooses to do so his creditor cannot subject the proceeds or profits therefrom to the satisfaction of his debt, nor in any way charge the donee therewith.

"2. A creditor has no remedy against either the corporation or the wife if his debtor contributes his services gratui-

tously to a corporation of which his wife is a heavy stockholder, and by so doing increases the dividends accruing to her, which she shares with him."

The Court said: "The law does not give to a creditor the right to appropriate the labor or personal services of a debtor for the satisfaction of his debt. From this it results, as is thoroughly well settled by our decisions, that a debtor may give his labor or services as a gratuity to another, and, when he chooses to do so, a creditor cannot subject the proceeds or profits therefrom to the satisfaction of his debt, nor in any way charge the donee therewith. [Citing many authorities.] * * *

"So, also, it is held that the dividends and profits accruing from corporate stock owned by a married woman are not liable for her husband's debts, although they are the result of his successful management of the corporation's business. *Taylor v. Wands,* 55 N. J. Eq., 491, 37 A., 315, 62 Am. St. Rep., 818; *Magerstadt v. Schaefer,* 213 Ill., 351, 72 N. E., 1063; *First Natchez Bank v. Moss,* 52 La. Ann., 1524, 28 So., 133.

"Manifestly, such a donation of labor or services presents no analogy to a donation of property which is subject to the claims of creditors, and the rules of law that govern fraudulent conveyances can have no application. * * * In the instant case, the husband of the respondent, Josephine Allen, could lawfully render service to the respondent corporation, with the understanding that its value should go to his said wife by way of increased dividends on her shares of corporate stock; and such an arrangement, whatever their intention may have been as to keeping his earnings out of the reach of creditors, was not a fraud on them, because it did not take from them anything which they could appropriate to the satisfaction of their demands. Even a fraudulent intent does not make a lawful gift or transfer unlawful."

In *Pierson v. Garrison*, 83 N. J. Eq., 334, 91 A., 824, the syllabus is: "A judgment creditor of a husband may not compel him to work, or to charge for services he renders to others, nor can the creditor complain if the debtor works for his wife without pay, provided the business in which the debtor is employed really belongs to the wife."

It seems clear, therefore, that there can be no legal objection to the formation of the corporation and the carrying out of the business agreement entered into between the corporation and the defendant Reese as to advancements of money for its operation. He evidently did so in good faith and is entitled to the securities which the corporation delivered and executed to him. We think that there is no possible ground for holding that the formation of the corporation was null and void. It was legally organized, and conducted a large amount of business. The fact, if it be a fact, that the creditors may have the right to require E. T. Summersett and the stockholders to account to them for the money put into the corporation by E. T. Summersett or for the value of the stock in which it was invested cannot affect the validity of the legal existence of the corporation or of the rights of Reese, a *bona fide* legal lienee of the corporation in the securities executed and delivered to him. Whatever right the creditors may have in the assets of the corporation are subject, of course, to the valid liens upon them.

We particularly adhere to these views in consideration of the fact that the judgment creditors are standing upon a strictly technical ground by reason of the accidental omission of their claim in the schedule of liabilities filed by the bankrupt.

The judgment of this Court is that the decree of the Circuit Court be reversed and the complaint dismissed, without prejudice to the right of the plaintiff in a different suit to require an accounting of the money, if any, furnished by E. T. Summersett in the organization of the corporation and

a consequent interest in the assets of the corporation after its debts and liens shall have been extinguished.

MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE CARTER (dissenting) : This was an action commenced on the 6th day of March, 1926, as a suit growing out of supplementary proceedings brought by Frank Smathers and Richard J. Cotter against E. T. Summersett, by virtue of a deficiency judgment obtained in a foreclosure proceeding in 1920.

The plaintiffs, Smathers and Cotter, claimed that E. T. Summersett was insolvent. This was not denied, and on their motion J. M. Cantey, Jr., was appointed Receiver, who filed this suit, claiming that Edward L. Summersett & Co. was a fraud, and any property it might have was in fact the property of E. T. Summersett.

In this suit Jesse T. Reese was made a party defendant, and the plaintiff Receiver claims judgment against Jesse T. Reese; that any securities or liens held by him against Edward L. Summersett & Co. be set aside in so far as the judgment of the plaintiffs, Smathers and Cotter, is concerned; and that such judgment be paid ahead of any claims or demands of the said Jesse T. Reese.

Issues were joined by the filing of answers on the part of the several defendants, and finally the case was heard before Judge W. H. Townsend in equity on February 9 and 11, 1927.

This hearing resulted in a decree filed by Judge Townsend giving judgment in favor of the plaintiff, and holding that Edward L. Summersett & Co. was fraudulently conceived and operated, and amounted to a hiding of assets on the part of E. T. Summersett. The decree further subjected such assets to the payment of the judgment of Smathers and Cotter, and that the claim of such plaintiffs was paramount to and should be paid prior to any claim or demand held by Jesse T. Reese against the assets of Edward L. Summersett

& Co. The decree also gives personal judgments against Jesse T. Reese for the amount claimed by the plaintiffs.

All of the defendants in the case appealed except Roof Lumber Company and Marion A. Park, the defendant Jesse T. Reese filing separate exceptions herein, and the other defendants, including Edward L. Summersett & Co., E. T. Summersett, Cora Lee Summersett, Sr., and the children, filing one set of exceptions as covering their appeal herein.

For the reasons stated in the decree of his Honor, Judge W. H. Townsend, the appellants' exceptions, in my opinion, should be overruled, and the judgment of the Circuit Court affirmed.

MR. CHIEF JUSTICE WATTS concurs.