JOY HARPER (OWENS) SCOTT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11233–76.     Filed April 27, 1978.

*N. A. Townsend, Jr.,* and *John M. Geil,* for the petitioner.
*Gary F. Walker,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined that the petitioner was liable as a transferee of E. L. Scott for deficiencies in income tax, additions to tax, and interest in the total amount of $146,530.60. There is no dispute over the liability of E. L. Scott for such deficiencies, additions to tax, or interest. The principal issues remaining for decision are: (1) Whether the petitioner's husband transferred to her the proceeds from the

sale of a life interest in certain real property; and (2) whether the petitioner is liable as a transferee for the profits received by her from a business which was conducted by her husband and to which she made only a nominal contribution of capital and services.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Joy Harper (Owens) Scott, resided in New Bern, N. C., at the time she filed her petition in this case.

Joy Harper (Owens) Scott and E. L. Scott were married on March 7, 1970. From 1965 to the time of her marriage to Mr. Scott, Mrs. Scott's gross earnings were about $4,000 each year. She also received $175 per month in support payments from her former husband. Mrs. Scott's net worth at the time of her marriage to Mr. Scott was about $10,000, consisting of cash, securities, an automobile, furniture, and household goods. She owned no real estate at the time of the marriage.

Mr. Scott was insolvent at the time of the marriage, and he has remained insolvent since that time.

On March 7, 1970, Mr. Scott was, and had been since 1963, the president of E. L. Scott Roofing Co., Inc. (Scott Roofing), a North Carolina corporation engaged in the roofing business in and about the town of Kinston, N. C. On October 12, 1970, Mr. Scott was indicted under section 7201 of the Internal Revenue Code of 1954,[1] on charges of willfully attempting to evade part of the income taxes of Scott Roofing for the years 1964 through 1966, and of attempting to evade the income taxes of E. L. Scott and Bernice Scott (his former wife)[2] for the years 1964 through 1966. On November 29, 1971, Mr. Scott pled guilty to Count 3 of the indictment, which charged him with filing false and fraudulent income tax returns on behalf of Scott Roofing for 1966; he pled not guilty to all other charges. His guilty plea was accepted on November 29, 1971, and all other charges were dismissed.

On December 30, 1972, pursuant to an agreement reached

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise indicated.

[2] Bernice Scott died on Sept. 26, 1969.

between Mr. Scott and the Commissioner, the following deficiencies in income taxes and additions to the tax were assessed against Mr. Scott:[3]

| Year | Income tax | Sec. 6653(b) addition |
|------|------------|------------------------|
| 1963 | $6,243.84 | $3,121.92 |
| 1964 | 11,194.19 | 5,597.10 |
| 1965 | 33,992.41 | 16,996.21 |
| 1966 | 14,205.12 | 7,102.56 |

As of November 24, 1976, the date of the notice of transferee liability issued to Mrs. Scott, Mr. Scott's unpaid tax liabilities for the years 1963 through 1966 were as follows:

| Year | Tax | Addition | Interest | Liability |
|------|-----|----------|----------|-----------|
| 1963 | $3,583.04 | $3,121.92 | $5,037.32 | $11,742.28 |
| 1964 | 11,194.19 | 5,597.10 | 9,372.76 | 26,164.05 |
| 1965 | 33,791.75 | 16,996.21 | 26,412.36 | 77,200.32 |
| 1966 | 14,205.12 | 7,102.56 | 10,116.27 | 31,423.95 |
| Totals | 62,774.10 | 32,817.79 | 50,938.71 | 146.530.60 |

As of March 7, 1970, Mr. Scott and his nephew Rufus Scott held title to an undivided life interest in certain real estate located on the Trent River, Jones County, N. C. (the Trent River property). Such interest had been acquired on February 16, 1956, from James Edward Mallard. Mr. Mallard had asked Mr. Scott to loan him the funds necessary to purchase the Trent River property; in consideration for such loan, Mr. Mallard agreed to convey a life interest in the Trent River property to Mr. Scott. At the request of Mr. Scott, his nephew also was named as a grantee of the life interest in the Trent River property.

Mr. Scott's nephew paid no consideration for his life interest in the Trent River property and did not participate in any manner in the negotiations leading to the acquisition of such interest. The nephew was named as a grantee, at Mr. Scott's request, to prolong the period before the use of the property would revert to Mr. Mallard. Mr. Scott's nephew did not use the property, other than for occasional visits with his uncle, nor did he contribute financially toward the construction of improve-

---

[3]The liabilities assessed were the individual income tax liabilities of E. L. Scott and Bernice Scott.

ments on the property. On the other hand, Mr. Scott used and enjoyed the property and constructed improvements on it.

On November 5, 1971, Mr. Mallard's daughter purchased the life interest in the Trent River property and had such interest conveyed to her father. Although Mr. Scott's nephew joined as a grantor in the deed conveying the life interest to Mr. Mallard, he took no part in the negotiations with Mr. Mallard's daughter, which were conducted solely by Mr. Scott. Mr. Scott's nephew was not even aware of the amount Mr. Mallard's daughter paid for the life interest. Mr. Scott's nephew always considered his uncle to be the owner of the life interest in the Trent River property and considered himself to have "no interest in it whatsoever."

Mr. Mallard's daughter paid a total of $17,500 for the conveyance of the life interest in the Trent River property to her father; of such amount, $2,500 was paid for furniture which was left in the house on the property. Some of such furniture belonged to Mrs. Scott and had been acquired by her prior to her marriage to Mr. Scott. The sales proceeds of $17,500 were received by Mrs. Scott and were expended on a residence purchased by her in New Bern, N. C., where she and her husband continued to reside at the time of the trial in this case. Mrs. Scott held sole title to the residence and owned all of the personal property and fixtures in the residence. Mr. Scott's nephew reported no income from the sale on his Federal income tax return and did not file a gift tax return reporting a gift to Mrs. Scott of the property or the proceeds from its sale because he had no interest in the property.

On February 15, 1973, Mr. Scott owned 284 of the 570 issued and outstanding shares of stock of Scott Roofing, a 49.8–percent interest. On February 16, 1973, he resigned his position as president of Scott Roofing and entered into an agreement with such corporation whereby his stock was to be redeemed by the corporation. On the same date, he and the corporation also entered into an amendment to the redemption agreement. Under the terms of the agreements, the corporation agreed to: cancel Mr. Scott's indebtedness to the corporation, not to exceed $71,000; assume a debt, not to exceed $41,000, that he owed to First Citizens Bank & Trust Co., Kinston, N. C.; transfer to him

all the shares that the corporation held in the Kinston Motel Co.;[4] allow him to purchase corporate insurance policies on his life at cash surrender value;[5] and employ Mr. Scott at his then present salary through April 30, 1973.

In addition, the redemption agreement contained the following convenant:

6. *Covenant Not to Compete.* In consideration of the Corporation redeeming the Two Hundred and Eighty-Four (284) shares owned by the Selling Shareholder, the Selling Shareholder and his spouse, Joy Harper Scott, * * * covenant with the Corporation that neither of them * * * will establish, engage in, or become interested in, directly or indirectly * * * any business engaged in roofing or reroofing structures other than personal residences * * * . *It is stipulated and agreed that the Selling Shareholder has notified the Corporation that his spouse, Joy Harper Scott, intends to form a corporation, to be known as Quality Roofing Company, and that said corporation plans to engage in the business of roofing and reroofing personal residences, and it is agreed between the parties that this business activity alone * * * is excluded from this covenant not to compete.* * * * [Emphasis supplied.]

In connection with Quality Roofing Co. (Quality), the amendment to the redemption agreement contained the following provision:

3. It is agreed between the parties that the corporation shall subcontract to Quality Roofing Company, Inc. (a corporation to be formed) the New Bern Housing Project re-roofing job and the Kinston Housing Project re-roofing job upon the terms hereinafter set forth. *The Selling Shareholder shall cause Quality Roofing Company, Inc., to furnish all management and supervision for the proper completion of said re-roofing jobs,* and all other items in connection therewith, including materials, equipment, labor, proper insurance, etc., shall be furnished by the Corporation. *For its services in connection with said jobs, the Corporation shall retain from the contract price an amount equal to five percent (5%) of the total contract price. The balance of the contract price, after payment of all expenses incurred in connection with said job shall be paid over by the Corporation to Quality Roofing Company, Inc.* [Emphasis supplied.]

On February 20, 1973, Quality was incorporated, with Mrs. Scott contributing $500 as its capital; no other capital contribution was made. All of the capital stock of Quality was issued to

---

[4]In the redemption agreement and in some of the exhibits filed in this case, this company was referred to as the Kinston Motel Co. In the stipulation of facts and in other exhibits, the company was referred to as the Kinstonian Motel or the Kinstonian Motel Co. For clarity, we will refer to the company throughout our opinion as the Kinston Motel Co.

[5]At the time of the redemption agreement, Scott Roofing owned two such insurance policies. One policy, in the amount of $18,258, was purchased by Mr. Scott for its cash value. When premiums became past due in April 1973, the policy was placed on the automatic nonforfeiture provision, and the coverage expired July 16, 1976. Mr. Scott did not purchase the second policy.

Mrs. Scott. The corporation elected to be treated as a small business corporation under subchapter S (sec. 1371 et seq.), and such election remained in effect at the time of trial.

The amendment to the redemption agreement was performed according to its terms. Upon Quality's formation, Scott Roofing subcontracted to Quality two roofing jobs, known as the Kinston Housing Project and the New Bern Housing Project. Quality performed as subcontractor on the two jobs and received a total of $66,719.38 for its work.

Since its organization in 1973, Quality has had from 6 to 14 employees. In addition, Quality subcontracted work to others. In carrying on its business, Quality purchased and utilized equipment including kettles, trucks, ladders, and staging. Quality's gross receipts for the years 1973 through 1976 were as follows:

Short period ended 9/30/73 ............... $44,635.35
Fiscal year ended 9/30/74 ................. 329,793.28
Fiscal year ended 9/30/75 ................. 298,131.25
Fiscal year ended 9/30/76 ................. 129,896.01

Mr. and Mrs. Scott filed joint Federal income tax returns for the years 1973 through 1976. On such returns, Mrs. Scott reported income based on the net distributable earnings of Quality as follows:

Short period ended 9/30/73 ................. $3,820.86
Fiscal year ended 9/30/74 ................... 57,977.67
Fiscal year ended 9/30/75 ................... 15,444.10
Fiscal year ended 9/30/76 ................... 13,400.72
                                             90,643.35

Mrs. Scott received income distributed from Quality as follows:

Short period ended 9/30/73 ................... $779.88
Fiscal year ended 9/30/74 ................... 46,341.45
Fiscal year ended 9/30/75 ................... 10,112.27
Fiscal year ended 9/30/76 ............... [6]10,525.30
                                           67,758.90

Mr. Scott has been in the roofing business since 1940. He was

---

[6]The parties stipulated that Quality distributed $10,525.30 to Mrs. Scott during its fiscal year ended 9/30/76, and we have accepted the stipulated fact. However, the income tax return filed by Quality indicated that distributions of $23,926.02 were made.

brought up in the business by his father and took over the business at his father's death. Until his resignation, he ran the business of Scott Roofing as its president, supervising its employees and jobs in the field. He was recognized as experienced in the roofing business. On the other hand, Mrs. Scott had never worked for a roofing company and had no experience in that area prior to Quality's incorporation.

Mrs. Scott was not familiar with the circumstances surrounding Quality's incorporation. She was aware that $500 in cash was used to capitalize the corporation, all of the capital stock of which was issued to her, but could not remember the source of the $500. She was not aware of what costs were incurred in Quality's incorporation.

Mr. and Mrs. Scott were the directors of Quality. Mr. Scott was the president, and Mrs. Scott was the secretary-treasurer of the corporation. Both were authorized to sign corporate checks. Quality's office was maintained at Mr. and Mrs. Scott's residence. Mrs. Scott performed all secretarial and office work but received no wages or salary from Quality. Mr. Scott, as chief executive officer of Quality, ran the business, and Mrs. Scott followed his directions. Mr. Scott and Quality were considered by others to be one and the same.

On his income tax returns for the taxable years 1968 through 1972,[7] Mr. Scott reported the following salary from Scott Roofing:

|      |          |      |          |
|------|----------|------|----------|
| 1968 | $26,250  | 1971 | $51,850  |
| 1969 | 32,150   | 1972 | 16,850   |
| 1970 | 41,850   |      |          |

After Quality's incorporation, Mr. Scott received the following salary as president of Quality:

| | |
|---|---|
| Short period ended 9/30/73 | $3,750 |
| Fiscal year ended 9/30/74 | 9,000 |
| Fiscal year ended 9/30/75 | 4,500 |
| Fiscal year ended 9/30/76 | 0 |
| | 17,250 |

Mr. Scott became 65 years of age in 1975 and began drawing

[7] Mr. Scott filed joint returns with Mrs. Scott for 1970, 1971, and 1972.

maximum social security benefits. Although he was paid nothing by Quality in its fiscal year ended September 30, 1976, he continued to perform the same services for the corporation.

In addition to his interest in the Trent River property and his shares of stock in Scott Roofing, Mr. Scott owned the following assets as of March 7, 1970, when he married Mrs. Scott: rental real estate at 1809 Heritage Street, Kinston, N. C.; a residence at 304 Highland Avenue, Kinston, N. C.; stock in the Kinston Motel Co.;[8] and other miscellaneous assets which possibly included an automobile and equity in an insurance policy. On November 10, 1970, Mr. Scott sold the rental real estate to his nephew, Robert Scott, receiving about $1,000 for his equity in the property, which he used to pay debts and living expenses. On January 2, 1973, Mr. Scott sold his residence, receiving about $7,000 in sales proceeds, which he used to pay moving expenses, living expenses, and personal debts. Sometime after October 12, 1970, Mr. Scott disposed of his automobile and boat to two former employees, and the insurance policy on his life lapsed. From March 7, 1970, until the time of trial, Mr. Scott had purchased no real estate, automobiles, trucks, boats, or other large items. Neither Mr. nor Mrs. Scott owned an automobile; Quality owned a station wagon used by Mr. Scott and an automobile used by Mrs. Scott.

Prior to the February 16, 1973, redemption agreement between Mr. Scott and Scott Roofing, that corporation owned 1,380 shares of the issued and outstanding stock of the Kinston Motel Co. Pursuant to the redemption agreement, 542½ shares of Kinston Motel Co. stock were transferred by Scott Roofing to Mr. Scott. On April 30, 1973, and on March 2, 1976, Mr. Scott submitted to the Commissioner, pursuant to section 7122, offers to compromise his tax liability on the ground of inability to pay the total liability. The first such offer stated that Mr. Scott owned 542½ shares of Kinston Motel Co. stock, having a fair market value of $23,144, which were pledged to secure indebtedness in the amount of $15,000. The second offer stated that the fair market value of the shares was $33,330.18 and that the shares were pledged to secure an indebtedness of $10,000. The U. S. Government is currently engaged in litigation before a U. S.

---

[8]The disposition of such stock is not clear.

District Court on a priority of lien question with respect to such stock. At the time the transferee notice was issued, Mr. Scott owned no other assets against which any collection action could be taken.

## OPINION

Section 6901(a) provides that when there has been a transfer of property, the liability of the transferee, at law or in equity, for the taxes of the transferor may be assessed, paid, and collected in the same manner as in the case of the taxes with respect to which the liability was incurred. Such provision furnishes the Commissioner with a summary remedy for collecting from the transferee. *Commissioner v. Stern*, 357 U.S. 39, 42–45 (1958); *Pierce v. Commissioner*, 61 T.C. 424, 432 (1974); *Albert v. Commissioner*, 56 T.C. 447, 449 (1971). Prior to the enactment of the predecessor of section 6901(a), the Commissioner was required to bring a bill in equity or institute an action at law to enforce a transferee's liability, and the use of such procedures proved cumbersome. The predecessor of section 6901(a) was enacted to provide a simplified procedure by which the Commissioner could enforce a transferee's liability for the taxes of his transferor. *Phillips v. Commissioner*, 283 U.S. 589, 594 (1931).

The transferee provision, however, merely provides a procedure by which the Commissioner may collect taxes. The existence and extent of the liability of a transferee of property of the taxpayer is a question of State law. *Commissioner v. Stern, supra.* The Commissioner has the burden of proving all the elements necessary to establish the petitioner's liability as a transferee. Sec. 6902(a); Rule 142(d), Tax Court Rules of Practice and Procedure.

The first issue we must decide is whether the petitioner is liable as a transferee for the taxes of her husband as a result of her receipt of the proceeds from the sale of the life interest in the Trent River property. That the petitioner in fact received such proceeds, in the amount of $17,500, is undisputed. It is also undisputed that, at the time the petitioner received such proceeds, Mr. Scott was insolvent and that his liability for Federal taxes was already in existence.

Under the North Carolina fraudulent conveyance statute, a transfer made for no consideration at a time when the transferor is insolvent is fraudulent as to existing creditors

without regard to the transferor's intent. N.C. Gen. Stat. sec. 39–15 (Repl. vol. 1976); *Aman v. Waller*, 165 N.C. 224, 81 S.E. 162, 164 (1914); *Hobbs v. Cashwell*, 152 N.C. 183, 67 S.E. 495, 498 (1910). The petitioner concedes that her husband transferred some funds to her, but argues that the Commissioner has failed to meet his burden of proof, because he has failed to show the amount of such transfer. In support of such argument, the petitioner alleges first that part of the proceeds from the sale of the life interest in the Trent River property belonged to Mr. Scott's nephew, and that the nephew made a gift of his share of the proceeds to her. As the respective values of the nephew's and her husband's interests in the property were not shown, she argues that the Commissioner has failed to prove what part of the proceeds received by her constituted a transfer from her husband. Next, she argues that because some of the furniture in the house belonged to her, she supplied some consideration for the transfer of the proceeds to her. As the value of the furniture belonging to her was not shown, she concludes that the Commissioner has failed to establish the extent of her liability as a transferee. The Commissioner's position is that Mr. Scott's nephew had no economic interest in the Trent River property, and that, to the extent the petitioner contends that she provided some consideration for the transfer of the proceeds to her, the burden is upon her to come forward with evidence as to the existence and amount of such consideration.

From the record, it is clear that neither Mr. Scott nor his nephew intended that the nephew have any economic interest in the Trent River property during Mr. Scott's lifetime. The nephew provided no consideration for the life interest in the Trent River property. He neither used the property nor contributed toward the construction of any improvements. He was named as a grantee, at his uncle's request, for the sole purpose of prolonging the period before the use of the property would revert to Mr. Mallard. The nephew would acquire an economic interest in the property only if Mr. Scott died, not having disposed of the life interest, thereby leaving him as the sole titleholder. The nephew testified that he had no interest in the property and always regarded his uncle as the owner. The nephew reported no income from the sale of the property on his Federal income tax return and did not file a gift tax return

showing a gift of the property, or the proceeds from its sale, to the petitioner.

The fact that the nephew held legal title to an undivided life interest in the property notwithstanding, it is clear, under the circumstances of this case, that he had no beneficial interest in the property. Rather, he held title as a trustee under a parol trust for the benefit of his uncle. *Martin v. Underhill*, 265 N.C. 669, 144 S.E.2d 872, 876 (1965), and cases cited therein. Likewise, we find he had no interest in the proceeds from the sale of the life interest in the Trent River property. Such proceeds were the sole property of his uncle, Mr. Scott, and were transferred by Mr. Scott to his wife, the petitioner.

The petitioner's second argument, based on her claimed ownership of some of the furniture contained in the house, must also be rejected. Where a transfer from an insolvent husband to his wife is attacked for fraud, the burden is upon the wife to show the giving of consideration in the form of money paid, the discharge of a debt due from him to her, or the passage of something of value. *Peeler v. Peeler*, 109 N.C. 628, 14 S.E. 59, 61 (1891); cf. *Woodruff v. Bowles*, 104 N.C. 197, 10 S.E. 482, 485–486 (1889). In the case before us, the Commissioner established a transfer of $17,500 from Mr. Scott to the petitioner. The petitioner then had the burden of coming forward with evidence to show the extent to which she provided consideration for the transfer. The petitioner failed to testify as to what items of furniture belonged to her, or as to the value of such items. The testimony of her husband, to the effect that some of the furniture belonged to her, was not sufficient to satisfy her burden of coming forward with evidence to show the existence and extent of the consideration provided by her. Accordingly, we find that the Commissioner has proved that the petitioner is liable as a transferee for the income tax liabilities of her husband as a result of his transfer of $17,500 to her.[9]

The second and more significant issue is whether the

---

[9]It is not clear that the transfer technically comes within the ambit of the North Carolina fraudulent conveyance statute, in view of the fact that the proceeds were not transferred to the petitioner directly by her husband, but rather by a third party. *United States v. Haddock*, 144 F. Supp. 720, 724–725 (E.D. N.C. 1956). However, neither party has discussed this point. In any event, it is clear from the North Carolina case law that creditors of Mr. Scott could reach the proceeds from the sale of his interest in the Trent River property in the hands of his wife, the petitioner. *United States v. Haddock, supra; Michael v. Moore*, 157 N.C. 462, 73 S.E. 104, 106 (1911); *Webb v. Atkinson*, 124 N.C. 447, 32 S.E. 737, 738 (1899).

petitioner is liable as a transferee to the extent of the distributions made to her by Quality. Both parties recognized that the existence of transferee liability depends upon State law, but they both failed to cite or discuss cases which are relevant in deciding the applicable State law. The Commissioner's position, as we understand it, is that Quality was in fact the business of Mr. Scott, and that he transferred funds belonging to him to the petitioner by causing Quality to distribute its profits to her. In support of his position, the Commissioner has cited numerous cases dealing with the question of who is the owner of income for Federal income tax purposes. In our opinion, such cases have no bearing upon the question of the existence and extent of the petitioner's liability as a transferee *under State law*.

We have been unable to locate any North Carolina case which is similar factually to the case before us. However, there are cases in other jurisdictions which establish the principle that where the earnings of a business conducted in the wife's name are attributable solely to the judgment and business ability of the husband, without the investment of any capital by the wife, the profits of the business are liable for the insolvent husband's debts. *Greene v. Levinson*, 123 Wash. 370, 212 P. 569 (1923), cert. denied 262 U.S. 750 (1923); *Lachman v. Martin*, 139 Ill. 450, 28 N.E. 795 (1891); *Hamill v. Augustine*, 81 Iowa 302, 46 N.W. 1113 (1890); see also *Rice v. Rice*, 125 F. Supp. 900 (W.D. Ark. 1954); *In re Horgan*, 97 F. 319 (S.D. N.Y. 1899), affd. 98 F. 414 (2d Cir. 1899); *Southern Lumber Co. v. Riley*, 224 Ark. 298, 273 S.W. 2d 848 (1954). This principle has been explained by the Supreme Court of Illinois as follows:

an insolvent debtor cannot use his wife's name as a mere device to cover up and keep from his creditors the assets and profits of a business which is in fact his own. The marriage relation affords many opportunities for conducting schemes to defraud creditors; and hence transactions between husband and wife which have the appearance of being fraudulent will be closely scrutinized. It is a question of fact, to be determined from all the circumstances of the case, whether or not the husband is carrying on his own business, or is merely managing his wife's business. *It must clearly appear that the wife is the bona fide owner of the capital invested in the business, and that the accumulations which result from the conduct of the business are the legitimate outcome of the investment of her property.* [*Lachman v. Martin*, 28 N.E. at 796; emphasis supplied.]

This principle appears reasonable, and one which a North Carolina court would follow in deciding a case such as the one before us.

Here, we cannot find that the profits of Quality's business were the legitimate result of the petitioner's capital investment. We cannot find that such substantial profits were the result of her shoestring capital contribution of $500. Rather, we find that the business was in fact that of her husband, that the profits of the business were due to his efforts, and that the business was conducted in his wife's name to shield profits, which in fact belonged to him, from the claims of his creditors.

At the outset, it is clear from the record that, from the time of the criminal indictment, Mr. Scott began systematically to dispose of his assets, placing them beyond the reach of his creditors. He had more than 30 years of experience in the roofing business and wished to continue in such business. However, he could not conduct business in his own name, for had he done so, the profits of the business would have been subject to his creditors' claims. The petitioner, on the other hand, had no prior experience in the roofing business. Yet, when Quality was formed, all of its capital stock was issued to her in return for what was a nominal capital contribution. We cannot discern, nor has the petitioner advanced, any legitimate reason for conducting business in such manner.

During the 7 months following its incorporation, Quality had gross receipts of $44,635.35, and during its first full year of operations, it had gross earnings of $329,793.28. We reject the petitioner's contention that such substantial earnings were the legitimate result of her initial $500 capital contribution. Rather, we find the earnings of the business were attributable to Mr. Scott's efforts. From its inception, he managed Quality, yet he withdrew only a minimal salary, especially when compared to the salary he had received from Scott Roofing. In the initial stages, the income generated by his efforts was retained by Quality, forming the basis for its later financial success. After the business had been established, the earnings attributable to his efforts were distributed by Quality to the petitioner.

Moreover, we are mindful of the circumstances surrounding Quality's incorporation. Scott Roofing's promise to subcontract two jobs to Quality was part of the redemption agreement between Scott Roofing and Mr. Scott, and under the terms of such agreement, Mr. Scott was responsible for causing Quality to perform its obligations as subcontractor. The petitioner has made much of the fact that the contracts were not assigned or

transferred to Quality, but in our judgment, whether the contracts were assigned or whether the work was performed under a contract has no real significance. The significant facts are that Mr. Scott arranged for Quality to have substantial work to perform at the outset of its operations, and he saw to it that such work was performed with the resulting earnings by Quality. *Studds v. Fidelity & Deposit Co. of Maryland,* 267 F.2d 875, 878 (4th Cir. 1959), cert. denied 361 U.S. 876 (1959); *Childress v. Fidelity & Casualty Co. of New York,* 194 Va. 191, 72 S.E.2d 349, 354 (1952).

We have considered those cases holding that an insolvent husband may gratuitously provide his services in managing his wife's separate property, or her separate business, without subjecting either the value of his services or the profits realized by his wife to the claims of his creditors. *Pocomoke Guano Co. v. Colwell,* 177 N.C. 218, 98 S.E. 535 (1919); *Osborne v. Wilkes,* 108 N.C. 651, 13 S.E. 285 (1891); see also *Studds v. Fidelity & Deposit Co. of Maryland, supra; Cantey v. Edward L. Summersett & Co.,* 149 S.C. 513, 147 S.E. 635 (1929); *Childress v. Fidelity & Casualty Co. of New York, supra;* Annot., 28 A.L.R. 1046 (1924). Thus, in an early case, where a wife out of her separate funds purchased a foundry, which was managed for her by her insolvent husband, and from which she realized a handsome profit, it was held that the husband's creditors could not subject the profits of the business to their claims, or collect from the wife on a quantum meruit the reasonable value of the husband's services. *Osborne v. Wilkes,* 13 S.E. at 292. In a later case in which an insolvent husband donated to his wife his services in running her farm, it was held that the husband did not thereby acquire any interest in the crops or the profits of the farm which his creditors could subject to their claims. *Pocomoke Guano Co. v. Colwell,* 98 S.E. at 536–537.

The principle enunciated in such cases applies, however, *only* if the business is actually the wife's and not a device to keep from the husband's creditors the income of a business which is actually his own. *Studds v. Fidelity & Deposit Co. of Maryland,* 267 F.2d at 878, quoting 37 C.J.S. Fraudulent Conveyances, sec. 16(b) (1943). In other words, a husband is not permitted to conduct his own business in his wife's name, thereby placing the profits from the business beyond the reach of his creditors. Whether the business is in fact the wife's, or merely a device to

defraud the husband's creditors, is a question of fact. *Studds v. Fidelity & Deposit Co. of Maryland, supra; Childress v. Fidelity & Casualty Co. of New York,* 72 S.E.2d at 353–354. The issue is whether the business at its inception is a bona fide business of the wife.

We find the case before us to be distinguishable from those North Carolina cases holding that the husband's creditors may not reach the profits of a wife's business, which is managed for her by her husband. In those cases, the wife made a substantial initial capital investment which legitimately contributed to the realization of profits; such is not the case here. Instead, we find that the arrangement whereby all of the capital stock of Quality was issued to the petitioner to be a device to defraud creditors by placing the profits of a business, which was in fact the husband's, beyond their reach. Accordingly, we find the petitioner is liable as a transferee for the tax liabilities of her husband to the extent of Quality's distributions to her.

Finally, the petitioner argues that since her liability as a transferee is only secondary, such liability must be reduced to the extent that the transferor retained any assets which the Commissioner could have levied upon at the time the assertion of transferee liability was made.[10] *Gatto v. Commissioner,* 20 T.C. 830, 834 (1953). The Commissioner concedes that this is a correct statement of the law, but argues that it has no applicability to the case before us. At the time the transferee notice was issued, Mr. Scott's sole asset was the Kinston Motel Co. stock. At the time of the trial of this case, the U.S. Government was engaged in litigation in a U. S. District Court on a priority of lien question with respect to such stock. According to offers of compromise submitted to the Commissioner by Mr. Scott, such stock had a fair market value not in excess of $33,330.18. Assuming that the Government prevails and the value of such stock is applied against Mr. Scott's liability of $146,530.60, this still leaves an unpaid liability of $113,200.42, which is greatly in excess of the

---

[10]Both parties appear to have assumed that the liability is offset by assets still in the transferor's possession at the time the transferee notice was issued, rather than at the time of the assessment against the transferor, or as of the date of the transfer. We accept this assumption without expressing an opinion as to whether it is correct. Compare *Nau v. Commissioner,* 27 T.C. 999, 1002 (1957), with *Gatto v. Commissioner,* 20 T.C. at 834.

amount of transferee liability charged against the petitioner in this case, $85,258.90.[11] Thus, it is not necessary to reduce the petitioner's transferee liability by the value of the Kinston Motel Co. stock. Cf. *Nau v. Commissioner*, 27 T.C. 999, 1002 (1957).

To reflect concessions by the Commissioner.

*Decision will be entered under Rule 155.*

---

[11]The petitioner has made no argument concerning the existence or extent of her liability for interest. Compare *Swinks v. Commissioner*, 51 T.C. 13, 19 (1968); *Estate of Stein v. Commissioner*, 37 T.C. 945, 961 (1962).

